Citation Nr: 1743989 
Decision Date: 09/18/17 Archive Date: 10/10/17

DOCKET NO. 13-21 423 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in 
Winston-Salem, North Carolina


THE ISSUES

1. Entitlement to service connection for ischemic heart disease, to include as due to herbicide exposure.

2. Entitlement to service connection for type II diabetes mellitus, to include as due to herbicide exposure.

3. Entitlement to service connection for bilateral hearing loss.

4. Entitlement to service connection for tinnitus. 


REPRESENTATION

Veteran represented by: North Carolina Division of Veterans Affairs



WITNESS AT HEARING ON APPEAL

The Veteran 


ATTORNEY FOR THE BOARD

Saudiee Brown, Associate Counsel


INTRODUCTION

The Veteran served on active duty from March 1964 to March 1968.

These matters come before the Board of Veterans' Appeals (Board) on appeal from a March 2009 and March 2012 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Louis, Missouri, and the Department of Veterans Affairs (VA) Regional Office (RO) in Winston-Salem, North Carolina. The Board notes that jurisdiction rests with Winston-Salem, North Carolina. 

The Veteran testified at a videoconference hearing before the undersigned Veterans Law Judge in July 2016. A transcript of that hearing is of record.

The issues of entitlement to service connection for bilateral hearing loss and entitlement to service connection for tinnitus are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).



FINDINGS OF FACT

1. Resolving reasonable doubt in favor of the Veteran, the evidence of record establishes that he was likely exposed to herbicides during his military service.

2. The Veteran's diagnosed coronary artery disease (ischemic heart disease) is presumed to have been caused by his herbicide exposure in service.

3. The Veteran's diagnosed type II diabetes mellitus is presumed to have been caused by his herbicide exposure in service.


CONCLUSIONS OF LAW

1. Criteria for service connection for ischemic heart disease have been met. 38 U.S.C.A. §§ 1110, 1112, 1116, 1131 (West 2014); 38 C.F.R. §§ 3.30, 3.307, 3.309 (2016).

2. Criteria for service connection for type II diabetes mellitus have been met. 38 U.S.C.A. §§ 1110, 1112, 1116, 1131; 38 C.F.R. §§ 3.30, 3.307, 3.309.


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duty to Notify and Assist

VA has a duty to provide claimants with notice and assistance in the development of their claim. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. §§ 3.102, 3.159 (2016). In light of the fully favorable decision herein, no further discussion of compliance with VA's duty to notify and assist is necessary. See Mlechick v. Mansfield, 503 F.3d 1340 (Fed. Cir. 2007).

II. Service Connection

The Veteran contends he has ischemic heart disease and type II diabetes mellitus that are related to exposure to herbicides while he was stationed in Thailand during the Vietnam era.

Service connection may be granted for disability due to disease or injury incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. Service connection may also be granted for any disease initially diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303 (d). 

Certain chronic diseases (to include diabetes mellitus, hypertensive cardiovascular disease and malignant tumor) may be service connected on a presumptive basis if manifested to a compensable degree in a specified period of time postservice (one year for diabetes mellitus, hypertensive cardiovascular disease and malignant tumor). 38 U.S.C.A. §§ 1112, 1113 (West 2014); 38 C.F.R. §§ 3.307, 3.309.

Additionally, if a veteran was exposed to an herbicide agent during active military, naval, or air service, certain diseases, including ischemic heart disease and type II diabetes mellitus, shall be service connected if manifest to a degree of 10 percent disabling or more at any time after service. 38 C.F.R. § 3.307 (a)(6). This presumption of service connection will attach, even in the absence of any evidence of the disease while in service, provided that the rebuttable presumption provisions of 38 U.S.C.A. § 1113 and 38 C.F.R. § 3.307 (d) are also satisfied. 38 C.F.R. § 3.309 (e).

To substantiate a claim of service connection, there must be evidence of: the claimed disability; incurrence or aggravation of a disease or injury in service; and a nexus between the disease or injury in service and the current disability. See Shedden v. Principi, 381 F.3d 1163, 1166-1167 (Fed. Cir. 2004). The determination as to whether these requirements are met is based on an analysis of all the evidence of record and the evaluation of its credibility and probative value. Baldwin v. West, 13 Vet. App. 1 (1999); 38 C.F.R. § 3.303 (a).

When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107 (b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

Lay assertions may also serve to support a claim for service connection by supporting the occurrence of lay-observable events or the presence of disability or symptoms of disability subject to lay observation. 38 U.S.C.A. § 1153 (a); 38 C.F.R. § 3.303 (a); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); see Buchanan v. Nicholson, 451 F. 3d 1331, 1336 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability even where not corroborated by contemporaneous medical evidence). 

Based on a review of the evidence of record, the Board finds that service connection for ischemic heart disease and type II diabetes mellitus are warranted on a presumptive basis. 

As an initial matter, the Veteran's treatment records reflect that he has been diagnosed with coronary artery disease and type II diabetes mellitus. Diabetes mellitus and coronary artery disease (encompassed by "ischemic heart disease") are conditions associated with exposure to herbicide agents under 38 C.F.R. § 3.309 (e). Thus, the pertinent question is whether the Veteran was, in fact, exposed to herbicides during service.

The Veteran's service personnel records show that he served at U-Tapao Air Base in Thailand from February 1967 to April 1967 with a military occupational specialty (MOS) of jet engine mechanic. These records show that his duties involved performance of engine changes and phase inspections of aircraft and supervising the troubleshooting and correction of malfunctions during launches and recoveries of B-52 and KC-135 jet aircraft. He asserts that he had significant exposure to the base perimeters of the base and was therefore exposed to herbicides. 

The Veteran reported in an April 2009 statement that he flew over Vietnam during refueling missions. In a March 2011 statement, the Veteran described his work as a jet engine mechanic which included launches and recovery. The Veteran was located on the flight line and both ends of the runway. In addition, the barracks was near the perimeter fence and he would have to cover up his head to avoid suffocating due to the spray and drift of the chemicals. 

During his July 2016 videoconference hearing, the Veteran testified that his work put him on flying status where he flew missions over Vietnam and also on a launch and recovery team which took him to the base perimeter. He also described how the whole base was sprayed with Agent Orange which would fog into the tents the Veteran slept in and settle on his clothes and bedding. Spraying Agent Orange also killed all the foliage. 

VA has established specific procedures for verifying exposure to herbicides in Thailand during the Vietnam Era. See VA Adjudication Manual, M21-1MR, Part IV, Subpart ii, Chapter 2, Section C ("M21-1MR"). VA has determined that there was significant use of herbicides on the fenced-in perimeters of military bases in Thailand intended to eliminate vegetation and ground cover for base security purposes as evidenced in a declassified Vietnam era Department of Defense document titled "Project CHECO Southeast Asia Report: Base Defense in Thailand." Special consideration of herbicide exposure on a facts-found or direct basis should be extended to those veterans whose duties placed them on or near the perimeters of Thailand military bases. This allows for presumptive service connection of the diseases associated with herbicide exposure. 

The majority of troops in Thailand during the Vietnam era were stationed at the Royal Thai Air Force Bases of U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat, and Don Muang. If a veteran served on one of these air bases as a security policeman, security patrol dog handler, member of a security police squadron, or otherwise served near the air base perimeter, as shown by MOS (military occupational specialty), performance evaluations, or other credible evidence, then herbicide exposure should be acknowledged on a facts found or direct basis. However, this applies only during the Vietnam era, from February 28, 1961, to May 7, 1975. See M21-1MR, Part IV, Subpart ii, Chapter 2, Section C.10 (q).

The Board has considered the Veteran's testimony and finds that the evidence shows that he was, based on his duties and his duty location, exposed to herbicides while in Thailand. He served on an air base where exposure was possible, and moreover, he describes duties that brought him in close proximity to the perimeter of the base. These duties seem consistent with his MOS and are consistent with performance evaluations of record. There is no reason to doubt the credibility of the Veteran's testimony. As such, the Board acknowledges herbicide exposure on a facts-found basis. 

Thus, the Board finds that the Veteran was exposed to herbicides in service. Given the above, the Board concludes that the Veteran is entitled to presumptions based on herbicide exposure. See 38 C.F.R. §§ 3.307, 3.309. 

The record establishes that the Veteran currently has coronary artery disease (which is encompassed by "ischemic heart disease") and type II diabetes mellitus, as shown in his treatment records. As such, service connection for ischemic heart disease and type II diabetes mellitus is granted as due to in-service herbicide exposure. 38 C.F.R. §§ 3.307, 3.309(a).


ORDER

1. Entitlement to service connection for ischemic heart disease, to include as due to herbicide exposure is granted.

2. Entitlement to service connection for type II diabetes mellitus, to include as due to herbicide exposure is granted.



REMAND

The Veteran seeks entitlement to service connection for bilateral hearing loss and entitlement to service connection for tinnitus due to noise exposure during service. As noted above, the Veteran's MOS during service was a jet engine mechanic.

Unfortunately, a remand is required in this case. Although the Board sincerely regrets the additional delay, it is necessary to ensure that there is a complete record upon which to decide the Veteran's claims so that he is afforded every possible consideration.

In February 1964, the Veteran's entrance examination noted evidence of a high frequency hearing loss. 

Where a preexisting disorder is noted upon entry into service, the Veteran cannot bring a claim for service connection for that disorder, but the Veteran may bring a claim for service-connected aggravation of that disorder. In an aggravation case, 38 U.S.C.A. § 1153 applies, and the initial burden falls on the Veteran to establish an increase in the severity of the preexisting disability. If such an increase is established, then the presumption of aggravation arises, and the burden shifts to VA to rebut the presumption of aggravation through clear and unmistakable evidence that such worsening was due to the natural progress of the disease. 38 C.F.R. § 3.306.

In November 1967, the Veteran's hearing was within normal limits and the Veteran denied hearing loss.

On a July 2010 VA examination, the Veteran described his exposure to noise during service due to his work as a jet engine mechanic. He reported a ringing sound present for 40 years. The examiner was unable to resolve the current issues of hearing loss and tinnitus without resorting to mere speculation. The examiner noted that induction testing completed in February 1964 revealed some hearing loss which was later confirmed by additional testing in April 1966. The Veteran did not report any hearing or ear related issues at separation. The examiner found that separation hearing testing failed to find the same hearing loss previously noted during service and said that this was highly unlikely, which brought the separation test results under question. This opinion is inadequate as it does not address the Veteran's exposure to noise during active duty service or his complaints of ringing for 40 years. 

On a December 2011 VA examination, the examiner opined that it was less likely than not that the Veteran's hearing loss was a result of or caused by military noise exposure. The examiner reasoned that the Veteran showed a pattern of hearing loss at induction in February 1964, hearing within normal limits in April 1966 and hearing within normal limits in January 1967. The examiner stated that this pattern of results was highly suspect because in the absence of conductive hearing loss, results did not improve over time. The examiner said that the induction audiogram was the most suspect because of asymmetry found with the left hear worse than the right ear. It was noted that the Veteran had previously reported that he hunted, occasionally firing left handed. The examiner said that left handed shooters typically presented with an asymmetry between ears with the right ear being worse than the left. In addition, the examiner noted that the Veteran reported working around machine noise for at least 20 years following service with an additional 20 years working in the office. The Veteran reported that he had noticed hearing difficulty for the past 20 to 30 years. The examiner found that this time frame placed the Veteran in occupational noise for at least 10 years following his time in service before he reported hearing difficulty. 

Regarding tinnitus, the Veteran described symptoms of tinnitus once a week lasting 5 to 10 minutes for around 40 years. The examiner opined that the Veteran's tinnitus was less likely than not a symptom associated with the Veteran's hearing loss and less likely than not caused by or a result of military noise exposure. The examiner reasoned that the Veteran's tinnitus was not consistent with what was generally reported by patients with recurrent tinnitus. Specifically, the examiner stated that the Veteran's tinnitus happened very infrequently and lasted for only a few minutes whereas noise-induced tinnitus onset was typically attributed to a specific event and constant in nature. Overall, the examiner's opinion regarding the Veteran's hearing loss and tinnitus is inadequate as it did not address the Veteran's exposure to noise in service as a jet engine mechanic.

In July 2016, the Veteran testified at a videoconference hearing that he was exposed to high pitched noise and constant noise as a jet engine mechanic in service. The Veteran described how his hearing gradually became worse in service as he worked on several different kinds of jet engines at full thrust. He said they had minimal hearing protection. He reported that he first noticed ringing in his ears after a full day of working on the jet engines. 

The Board notes that there is a July 2008 private positive nexus opinion for the Veteran's claim for hearing loss. This opinion was enclosed in a July 2011 private letter in support of the Veteran's claim. However, this opinion was not based on a review of the Veteran's claims file and reflects that the examiner was unaware of pertinent information regarding the Veteran's history. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 301 (2008). Therefore, the opinion is also insufficient for the Board to rely on in making a decision on the Veteran's claim. 

Once VA has provided a VA examination, it is required to provide an adequate one, regardless of whether it was legally obligated to provide an examination in the first place. Barr v. Nicholson, 21 Vet. App. 303 (2007). A medical examination report must contain not only clear conclusions with supporting data, but also a reasoned medical explanation connecting the two. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008); Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007).


Accordingly, the case is REMANDED for the following actions:

1. Obtain any outstanding VA treatment records and associate those documents with the Veteran's claims file.

2. After completion of the foregoing, forward the Veteran's claims file to the December 2011 VA examiner, or an appropriate substitute if unavailable, for an addendum opinion which addresses the Veteran's claims folder and any pertinent medical records. If necessary, schedule the Veteran for another physical examination. The examiner should address the following questions:

Is it at least as likely as not (50 percent change or greater) that the Veteran's bilateral hearing loss permanently increased in severity because of noise exposure incurred during active duty service?

If there was a permanent increase in severity of bilateral hearing loss during active duty, then is there clear and unmistakable evidence that the permanent increase in severity was due to the natural progression of bilateral hearing loss?

Is it at least as likely as not (50 percent chance or greater) that the Veteran's tinnitus was caused by noise exposure incurred during active duty service?

For purposes of these questions, the examiner should consider the Veteran's statements that he worked with and around jets in conjunction with the duties of his MOS of jet engine mechanic and that he had minimal hearing protection. 

A report of the opinion should be prepared and associated with the Veteran's VA claims file. A complete rationale must be provided for all opinions rendered. If the reviewing clinician cannot provide any of the requested opinions without resorting to mere speculation, he or she should expressly indicate this and provide a supporting rationale as to why an opinion cannot be made without resorting to mere speculation.

3. Then readjudicate the Veteran's claim. If any benefit remains denied, issue an appropriate Supplemental Statement of the Case, and give the Veteran and his representative an appropriate opportunity to respond. The case should then be returned to the Board, if otherwise in order, for further appellate review.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
MICHAEL MARTIN
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs